| | |
|---|---|
| **AVERY RENEE WEBSTER,** )<br>)<br>)<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**U.S. DEPARTMENT OF ENERGY, et al.,** )<br>)<br>**Defendants.** )<br>) | **Case No: 15-cv-1261-RCL** |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Avery Renee Webster brings claims against her former employer, the United States Department of Energy ("DOE") for race discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count One), gender discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count Two), pregnancy related discrimination in violation of the Americans with Disabilities Act ("ADA") (Count Three), retaliation for filing complaints and engaging in other activity with the Equal Employment Opportunity Commission ("EEOC") (Count Four), and retaliation for whistleblower activity (Count Five).  Although not in named counts, Plaintiff also brings claims for hostile work environment under Title VII and the Rehabilitation Act.

Defendant now moves to dismiss plaintiff's complaint, or, in the alternative, for summary judgment [ECF No. 18].  For the reasons stated below, the Court will grant in part and deny in part defendant's motion.

## II.     BACKGROUND

Plaintiff, who is an African American female, was employed by DOE as an attorney-examiner in the Office of Hearings and Appeals ("OHA") from August 2007 through April 2012. Plaintiff's supervisors were Ms. Ann S. Augustyn, Ms. Janet N. Freimuth, Mr. Fred L. Brown, and Mr. Poli A. Marmolejos.

Plaintiff's complaint is based on several specific events that occurred throughout the course of her employment, some of which occurred during her high risk pregnancy from October 2010 through July 2011.  They are as follows: 1) she was denied regular flexi-place in February 2011; 2) she was denied medical flexi-place in February 2011; 3) she was denied the reasonable accommodation of a chair for her pregnancy in January and February 2011; 4) she was denied a promotion in May 2011; 5) she was issued a fourteen day suspension on October 3, 2011; 6) she received a performance rating of "needs improvement" on November 3, 2011; 7) she was given a counseling memorandum on November 3, 2011; 8) she was placed on a Performance Improvement Plan ("PIP") on February 24, 2012; 9) DOE management refused to return her personal banking information to her; 10) DOE officials "loaded [her] Personal Security Investigative File and OPM File with defamatory and inappropriate statements" thereby affecting her ability to get a security clearance; and 11) she was terminated from her position at DOE and removed from federal service employment on April 16, 2012.

During the course of the above described incidents, plaintiff initiated administrative proceedings.  On June 6, 2011[1] she initiated contact with an EEO counselor and on January 18, 2012, filed a formal EEO complaint with the Agency's Office of Civil Rights ("OCR"), alleging violations of Title VII and the ADA.  On February 6, 2012, she formally realleged that she had

---

[1] Plaintiff's timeline describes many previous instances in which plaintiff filed grievances, both informal and formal, and made complaints to OCR.  The June 6, 2011 date is most relevant here.

been subjected to a hostile work environment. On May 24, 2012, after she was removed from federal service, plaintiff added her removal as an additional issue in her EEO complaint. The allegations described above formed the basis of plaintiff's complaint.

On January 11, 2013, the OCR issued its Final Agency Decision, finding that the defendant had offered legitimate, nondiscriminatory reasons for the actions taken and that plaintiff failed to demonstrate pretext. On January 28, 2013, plaintiff filed a mixed-case appeal to the Merit Systems Protection Board ("MSPB"). Administrative Judge Ben-Ami considered plaintiff's removal and any affirmative defenses, but declined to consider the merits of the nine other issues raised in her complaint regarding actions taken prior to her removal. This decision was confirmed by MSPB Administrative Judge Clement on November 27, 2013. On September 12, 2014 Judge Clement issued her initial decision affirming DOE's decision to remove plaintiff from federal service. On October 16, 2014, plaintiff filed a petition to review the initial decision, and on July 6, 2015 received MSPB's final order affirming the initial decision.

## III.    LEGAL STANDARDS

### A.    Standards of Review

#### 1.    *Lack of Subject Matter Jurisdiction*

Courts must dismiss claims under Federal Rule of Civil Procedure 12(b)(1) when they lack subject matter jurisdiction over the claims. Courts may dismiss for lack of subject matter jurisdiction based on the complaint alone (a facial challenge), or "where necessary, . . . consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts" (a factual challenge). *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

### 2.    *Failure to State a Claim*

Under Rule 12(b)(6), courts may dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. Proc. 12(b)(6). To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted). When considering a motion to dismiss under Rule 12(b)(6), "the court must assume 'all the allegations in the complaint are true (even if doubtful in fact),' and the court must give the plaintiff 'the benefit of all reasonable inferences derived from the facts alleged.'" *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (internal citations omitted).

### 3.    *Summary Judgment*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010) (internal quotation marks omitted). To show that a dispute is "genuine" and defeat summary judgment, the nonmoving party must present evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." *Id.* (internal citations omitted).  Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Summary judgment is also appropriate when, "after adequate time for discovery," the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.      Substantive Legal Standards**

Plaintiff brings claims under Title VII, the Americans with Disabilities Act, the Whistleblower Protection Act, and for hostile work environment.

*1.      Title VII*

*a)      Race and Sex Discrimination*

Federal employment discrimination is prohibited by Title VII of the Civil Rights Act of 1964, under which it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

Title VII claims that rely on circumstantial evidence—as opposed to direct evidence of discrimination—are analyzed under the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, the employee "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *Id.* at 802.  In cases concerning race or sex discrimination—disparate treatment based on race or sex, a

prima facie case consists a showing that "(1) [the plaintiff] is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (internal quotation marks omitted).

A plaintiff's "burden of establishing a prima facie case of disparate treatment is not onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and the requirement of establishing a prima facie case "is 'not intended to be an inflexible rule.'" *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1353 (2015). Thus, "an individual plaintiff may establish a prima facie case by 'showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under' Title VII." *Id.*

If the employee establishes a prima facie case of discrimination, the burden "must shift to the employer to articulate some legitimate, nondiscriminatory reason for the" adverse action. *McDonnell Douglas*, 411 U.S. at 802. The employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the [the action]" so as to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254–55. The employer, however, "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254.

If the employer succeeds in offering legitimate, nondiscriminatory reasons for the action, the "plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 252. The plaintiff may demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing

that the employer's proffered explanation is unworthy of credence." *Id.* at 255. Either way, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Evidence of pretext may include "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

### i. *Pregnancy Discrimination*

Title VII specifically precludes discrimination on the basis of "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000(k). It mandates that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). Plaintiffs may bring disparate treatment claims under the Section 2000e(k). *See Young*, 135 S. Ct. at 1345. To establish a prima facie case of pregnancy discrimination based on the denial of an accommodation—*i.e.*, that the denial constituted disparate treatment, a plaintiff must show "that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'" *Id.* at 1354. Then, again, the burden shifts to the employer to show "'legitimate, nondiscriminatory' reasons for denying her accommodation," which "cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those ('similar in their ability or inability to work') whom the employer accommodates." *Id.* If the employer succeeds, the burden shifts back to the plaintiff to

demonstrate pretext. *Id.* For example, the plaintiff may "provid[e] sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination." *Id.*

### b) Retaliation

Title VII also prohibits retaliation for "an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013) (citing 42 U.S.C. § 2000e-3(a)). Retaliation claims are subject to the same *McDonnell Douglas* burden shifting as discrimination claims. *Walker*, 798 F.3d at 1091. To establish a prima facie case of retaliation, "the plaintiff must allege that she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct." *Id.* at 1091–92. With respect to the third element—causation—"Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test [for discrimination claims—that 'that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.' 42 U.S.C.A. § 2000e-2(m)]." *Nassar*, 133 S. Ct. at 2533. Thus, "it is not sufficient for [the] plaintiff to demonstrate that a reasonable jury could find that retaliatory animus . . . was *a* cause for [the adverse action]. Rather, [the] plaintiff must demonstrate that there is a genuine issue of material fact as to whether retaliatory animus was *the* cause for the [adverse action]." *Rattigan v. Holder*, 982 F. Supp. 2d 69, 81 (D.D.C. 2013), *aff'd*, 780 F.3d 413 (D.C. Cir. 2015).

Once the plaintiff establishes a prima facie case, "the burden shifts to the employer to identify the legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action." *Walker*, 798 F.3d at 1092. Then, the plaintiff must show "that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation." *Id.* The aforementioned categories of evidence demonstrating pretext in discrimination claims apply to retaliation claims. With respect to retaliation claims specifically, however, "temporal proximity between an employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation." *Id.*

### c) *Hostile Work Environment*

Title VII also prohibits a hostile work environment as a form of discrimination. "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). Courts are to look "to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance" to determine whether a hostile work environment exists. *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). However, the standards for judging hostility must be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788. Thus, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*

*d)*        *Simplified McDonnell Douglas Framework*

Despite its ubiquitous presence in Title VII cases, the issue of whether the plaintiff has established a prima facie case of discrimination under *McDonnell Douglas* "is almost always irrelevant." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). "[B]y the time the district court considers an employer's motion for summary judgment . . ., the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision . . . . That's important because once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" *Id.* Therefore, the D.C. Circuit has stated that

> [i]n a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Id.* at 494. This rule applies to retaliation claims as well. *See Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

The *Brady* rule does not, however, apply in every case. As the *Brady* court noted, the question of whether the plaintiff has established a prima facie case "is *almost* always irrelevant," 520 F.3d at 493 (emphasis added); *i.e.*, it is not always irrelevant. When an employer challenges whether an action taken against the plaintiff was an "adverse employment action"—which is an element of the prima facie case—courts should first determine whether the action was legally "adverse" before turning to whether that action occurred as a result of discrimination or retaliation. *See Baloch*, 550 F.3d at 1196–97 (acknowledging that "[i]n most employment discrimination cases

that reach federal court, there is no dispute that the employee has suffered an adverse employment action, and the sole question is whether the action occurred because of discrimination," but, because the employer in the instant case also contested whether the employee suffered an adverse action, considering first whether the element of adverse action was present); *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 119 (D.D.C. 2014) (Bates, J.), *aff'd*, 818 F.3d 751 (D.C. Cir. 2016). Furthermore, it is important to note that the evidence used to support a plaintiff's prima facie case, such as evidence that she was treated differently from similarly situated employees, does not become immediately irrelevant. "Rather, such evidence (or the lack of such evidence) may be relevant to the determination at summary judgment or trial whether intentional discrimination occurred." *Brady*, 520 F.3d at 494 n.2.

### 2. *Americans with Disabilities Act/Rehabilitation Act*

Plaintiff also brings claims under the ADA. The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).[2] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," as well as "the operation of a major bodily function." 42 U.S.C. § 12102(2). A "qualified individual" is "an individual who, with or without reasonable accommodation, can

---

[2] This is a provision of the ADA. The Rehabilitation Act specifically states that "the term the term 'individual with a disability' means . . . any person who has a disability as defined in section 12102 of Title 42." 29 U.S.C. § 705(20)(B).

perform the essential functions of the employment position that such individual holds or desires."
42 U.S.C. § 12111(8).  The ADA excludes from its definition of "employer" the United States and
corporations wholly owned by the United States, meaning it does not apply to federal government
employees.  *See* 42 U.S.C. § 12111(5)(B)(i).

However, the Rehabilitation Act, which incorporates the standards applied in ADA cases,
*Ward v. McDonald*, 762 F.3d 24, 28 (D.C. Cir. 2014) (citing 29 U.S.C. § 794(d)), provides a
remedy for federal employees alleging disability discrimination.  *See Barth v. Gelb*, 2 F.3d 1180,
1183 (D.C. Cir. 1993).  It provides that "[n]o otherwise qualified individual with a disability in the
United States . . . , shall, solely by reason of her or his disability, be excluded from the participation
in, be denied the benefits of, or be subjected to discrimination under any program or activity
receiving Federal financial assistance or under any program or activity conducted by any Executive
agency or by the United States Postal Service."  29 U.S.C. § 794(a).  The Rehabilitation Act
encompasses disparate treatment claims (intentional discrimination), failure to accommodate
claims, and hostile work environment claims.  *Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C.
2015) (collecting cases).

Again, the *McDonnell Douglas* burden shifting framework applies to discrimination claims
brought under the Rehabilitation Act.  *Kersey v. Washington Metro. Area Transit Auth.*, 533 F.
Supp. 2d 181, 189–90 (D.D.C. 2008), *aff'd*, 586 F.3d 13 (D.C. Cir. 2009).  To establish a prima
facie case of discrimination under the Rehabilitation Act for disparate treatment, "a plaintiff must
show, by a preponderance of the evidence, that she '[has] a disability within the meaning of the
[Act]; that [she] was "qualified" for the position with or without reasonable accommodation; and
that [she] suffered an adverse employment action because of [her] disability.'"  *Thompson v. Rice*,
422 F. Supp. 2d 158, 166 (D.D.C. 2006), *aff'd*, 305 F. App'x 665 (D.C. Cir. 2008).  The burden

then shifts back to the employer to provide legitimate, nondiscriminatory reasons for the action, and then again back to the plaintiff to demonstrate pretext. *Kersey*, 533 F. Supp. 2d at 190. Note, however, that the simplified *McDonnell Douglas* framework announced in *Brady* also may apply to discrimination claims brought under the Rehabilitation Act. *See Kersey v. Washington Metro. Area Transit Auth.*, 586 F.3d 13, 17 n.2 (D.C. Cir. 2009); *Ramsey v. Moniz*, 75 F. Supp. 3d 29, 48 (D.D.C. 2014).

The *McDonnell Douglas* burden shifting framework is not applicable to reasonable accommodation claims. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998). The ADA, which is incorporated into the Rehabilitation Act, defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie case for failure to accommodate, "a plaintiff must show '(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.'" *Thompson*, 422 F. Supp. 2d at 165–66.

The ADA and the Rehabilitation Act also cover claims for hostile work environment based on disability. *See Aldrich v. Burwell*, 197 F. Supp. 3d 124, 135 (D.D.C. 2016); *Floyd v. Lee*, 968 F. Supp. 2d 308, 328 & n.4 (D.D.C. 2013) (noting that "[a]lthough this circuit has not resolved the question, four circuits have found that hostile work environment claims are available under the ADA," and citing cases from the Tenth, Eight, Fifth, and Fourth Circuits). To state a prima facie

case of hostile work environment, a "plaintiff must show that (1) he is a member of a protected class, in this case a 'qualified individual with a disability;' (2) he was subject to unwelcome harassment; (3) the harassment occurred because of his disability; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment, but took no action to prevent it." *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 71 (D.D.C. 2005). Failure to accommodate may underlie hostile work environment claims in circumstances where "the jury can weigh a wrongful denial of accommodation alongside evidence of other harassment, and that other evidence can augment the weight of the denial by suggesting discriminatory animus." *Floyd v. Lee*, 85 F. Supp. 3d 482, 517 (D.D.C. 2015).

### 3. *Whistleblower Protection Act*

The Whistleblower Protection Act ("WPA") prohibits retaliatory "personnel action[s]" against employees who disclose information that the employee believes evidences "(i) any violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(b)(8). It "provides most federal agency employees with protection against agency reprisals for whistleblowing activity." *Stella v. Mineta*, 284 F.3d 135, 142 (D.C. Cir. 2002). "Personnel action[s]" include appointments, promotions, disciplinary or corrective actions, reassignments, performance evaluations, decisions concerning pay or benefits, and "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A).

WPA claims also follow a burden-shifting framework. *Miller v. Dep't of Justice*, 842 F.3d 1252, 1257 (Fed. Cir. 2016). First, the employee must "show 'by a preponderance of the evidence that he or she made a protected disclosure under § 2302(b)(8) that was a contributing factor to the employee's [personnel action].'" *Id.*; *see also Hanna v. Herman*, 121 F. Supp. 2d 113, 122 (D.D.C.

2000) ("Plaintiff must establish by a preponderance of the evidence that he made a protected disclosure, that subsequent to the disclosure he was subject to disciplinary action, and that the disclosure was a contributing factor to the personnel action taken against him."). If the plaintiff is successful in establishing this prima facie case, "the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken 'the same personnel action in the absence of such disclosure,' which we sometimes refer to as a showing of 'independent causation.'" *Miller*, 842 F.3d at 1257 (internal citations and quotation marks omitted). Courts may consider the following factors in making this independent causation analysis:

> [1] the strength of the agency's evidence in support of its personnel action; [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and [3] any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

*Id.*

## IV. ANALYSIS

### A. Title VII Claims

Plaintiff bases her Title VII claims on the following adverse actions: 1) she was denied regular flexi-place in February 2011; 2) she was denied medical flexi-place in February 2011; 3) she was denied the reasonable accommodation of a chair in January and February 2011; 4) she was denied a promotion in May 2011; 5) she was issued a fourteen day suspension on October 3, 2011; 6) she received a performance rating of "needs improvement" on November 3, 2011; 7) she was given a counseling memorandum on November 3, 2011; 8) she was placed on a Performance Improvement Plan ("PIP") on February 24, 2012; 9) DOE management refused to return her personal banking information to her; 10) DOE officials "loaded [her] Personal Security Investigative File and OPM File with defamatory and inappropriate statements" thereby affecting

her ability to get a security clearance; and 11) she was terminated from her position at DOE and removed from federal service employment on April 16, 2012.

1. *Dismissal/Summary Judgment is Not Appropriate for Seven of the Adverse Actions*

There are three important points to make at the outset of this discussion. First is the fact that there has been no formal discovery in this case. Plaintiff, who is representing herself pro se, has submitted a significant amount of documentary support with her opposition to plaintiff's motion, but the lack of formal discovery has hampered her ability to find and present evidence of discrimination or retaliation, if such evidence exists. Second, as of August 11, 2017, there has been a potential shift in the law regarding what constitutes an adverse employment action. The D.C. Circuit in *Ortiz-Diaz v. United States Dep't of Hous. & Urban Dev., Office of Inspector Gen.*, No. 15-5008, 2017 WL 3559454 (D.C. Cir. Aug. 11, 2017), indicated that certain actions may qualify as adverse under Title VII when they have an "impact on the employee's potential for career advancement." *Id.* at *4. It is unclear what impact the *Ortiz-Diaz* decision has on Title VII law, and it is also unclear at this point whether this case will be heard *en banc* by the D.C. Circuit. Of course, given the recent announcement of this decision, the parties have not had occasion to brief such issues.

The third point is with respect to plaintiff's claims regarding her security clearance investigation. Plaintiff began attempting to obtain a clearance in 2011. She states that if she was not able to obtain the necessary clearance, she would have been fired or effectively demoted, and thus a clearance was a condition of her continued employment. She indicates that her security clearance investigation opened in or around February 2011. Testimony was given as part of the clearance investigation between June 7, 2011 and June 23, 2011. On February 22, 2012, an initial request to reopen plaintiff's security clearance investigation was submitted to the Office of

Personnel Management ("OPM").  Plaintiff states that at that point, the investigation had been ongoing for almost one year, and infers that the investigation had been closed or was near completion when the request to reopen was submitted.    Plaintiff then alleges that between February and March of 2012 DOE officials raised concerns that prompted requests to reopen and expedite plaintiff's background investigation so that additional testimony could be provided.  She alleges between March 7, 2012 and April 1, 2012 DOE officials placed defamatory or inappropriate statements about plaintiff in her Personal Security Investigative File and OPM File.  She asserts that officials made negative and false statements regarding plaintiff's mental and emotional stability, judgment and reliability, professionalism and reputation, qualifications and education, marital status and children, living situation, religious practices, and failure to follow the chain of command.  She argues that these statements had zero utility in the security clearance investigatory process.  Plaintiff claims that the statements were made to prevent plaintiff from obtaining a security clearance, and because it was a condition of her continued employment, these were attempts to have her constructively discharged.  She also alleges that such actions were taken to prevent plaintiff from obtaining future employment in the federal and private sector, and that she has been unable to obtain a security clearance due to such actions, which has cost her a job offer and a promotion and has hampered her ability to find a new job.

Under the Supreme Court's 1988 decision in *Dep't of Navy v. Egan*, 484 U.S. 518 (1988), questions regarding security clearance decisions often evade judicial review.  The Court—reviewing claims brought by a Navy employee who was discharged when his security clearance was revoked—held that "the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the

Executive Branch." *Egan*, 484 U.S. at 527. Security clearance decisions are committed to the "broad discretion" of the agency responsible for making such decisions. *Id.* at 529.

*Egan* applies in the Title VII context. *See Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999). Those decisions that "require[] a '[p]redictive judgment' that 'must be made by those with the necessary expertise in protecting classified information'" are protected from judicial review. *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012) (quoting *Egan*, 484 U.S. at 529). However, not "*all* decisions that might bear upon an employee's eligibility to access classified information" are insulated from review. *Id.* The D.C. Circuit in *Rattigan* carved out an important exception to the *Egan* rule in the Title VII context: "Title VII claim[s] may proceed only if [the plaintiff] can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Id.* at 771 (considering whether an FBI employee could bring claims under Title VII based on allegations that FBI officials reported unfounded security concerns to the Bureau's Security Division thereby prompting an investigation into his eligibility for a security clearance). The Circuit reasoned that given that it is the duty of the courts "not only to follow *Egan*, but also to 'preserv[e] to the maximum extent possible Title VII's important protections against workplace discrimination and retaliation' . . . and given that . . . Title VII claims based on *knowingly* false reporting present no serious risk of chill[ing the timely and adequate reporting of security issues], we believe that claims of knowingly false security reports or referrals can coexist with *Egan*." *Id.* at 770.

Defendant argues that *Egan* completely bars judicial review of plaintiff's claims regarding the processing of her security clearance, but fails to recognize the *Rattigan* exception. Indeed, plaintiff's claims appear to fall squarely within the exception. Plaintiff argues that DOE officials knowingly placed false information about her in her files that would be reviewed in the security

clearance process and would prevent her from obtaining a security clearance. She is challenging those actions as discriminatory and retaliatory, not the "predictive judgments" of the officials responsible for making clearance decisions. If a plaintiff "can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they *knew* to be *false*," *Rattigan*, 689 F.3d at 771 (emphasis added), *Egan* does not bar judicial review. Defendant has not argued that the statements were not false or were not knowingly false, and has not presented evidence that would support such arguments.

The Court considers these allegations to be an important part of this case. The same DOE officials who made the allegedly false and defamatory statements—namely Janet Freimuth and Fred Brown—were also those who initiated and oversaw the other adverse actions at issue, such as the denial of a promotion, the suspension, the poor performance review, the counseling memorandum, the PIP, and the termination. Even if defendant raised legitimate, nondiscriminatory reasons for taking such actions, the Court finds that plaintiff may be able to demonstrate pretext if she shows that the statements made by Ms. Freimuth and Mr. Brown—the same officials who initiated the other adverse actions against her—were in fact false and that Mr. Brown and Ms. Freimuth knew they were false. Such evidence may be convincing enough to overcome defendant's proffered legitimate, nondiscriminatory reasons. However, given the lack of discovery and defendant's arguments regarding nonjusticiability, the Court is unable to consider this question at all at this point.

Thus, considering the allegations made, the lack of discovery, and the issues with respect to plaintiff's claims regarding her security clearance investigation, the Court finds that neither dismissal nor summary judgment in favor of defendant are appropriate for plaintiff's Title VII claims based on the following adverse actions: 1) the denial of a promotion in May 2011; 2) the

fourteen day suspension issued on October 3, 2011; 3) the performance rating of "needs improvement" on November 3, 2011; 4) the counseling memorandum issued on November 3, 2011; 5) the PIP issued on February 24, 2012; 6) the allegedly false and defamatory statements placed in plaintiff's Personal Security Investigative File and OPM File; and 7) plaintiff's termination on April 16, 2012.

### 2.   *Dismissal is Appropriate for Four of the Adverse Actions*

Nonetheless, the Court does find that dismissal is appropriate with respect to the following four allegedly adverse actions at issue based on the current record and the unlikelihood that further discovery will have any impact on such claims:  1) the denial of regular flexi-place in February 2011; 2) the denial of medical flexi-place in February 2011; 3) the denial of the reasonable accommodation of a chair in January and February 2011; and 4) DOE management's refusal to return plaintiff's personal banking information to her.

### a)   *Flexi-Place*

First, plaintiff alleges that she was denied flexi-place, but she was in fact granted flexi-place. On February 8, 2011 plaintiff requested a regular flexi-place schedule of teleworking three days per week.  *See* Request for Regular Flexiplace, Def.'s Ex. 6, ECF No 18-3.  On February 11, 2011, her request was "[a]pproved for 2 days (Tuesday + Thursday) with reevaluation of 3 day request at end of trial period."  *Id.* Section 4; *see also* Freimuth Aff. at 21, Def.'s Ex. 3, ECF No. 18-3.  Plaintiff was given two days of flexi-place per week because "[a]s a GS-13 attorney, [she] receive[d] more frequent supervision" than those GS-15 attorneys working one or two days flexi-place per week.  *See* Request for Flexi-Place at Section 4.  Ms. Freimuth further explained that none of the other employees she supervised were allowed flexi-place schedules of three or more days per week and that OHA management believed that more than two days of flexi-place would be disruptive and adverse to OHA's mission.  Freimuth Aff. at 22.  Simply put, although plaintiff's

complaint alleges that she was denied flexi-place, the record shows that plaintiff was in fact granted regular flexi-place in February 2011.[3]

On February 24, 2011, plaintiff submitted an application for medical flexi-place. *See* Request for Medical Flexiplace, Def.'s Ex. 7, ECF No. 18-4.  Ms. Freimuth consulted with the DOE Office of Human Capital which, on March 1, 2011, referred the request to a Federal Occupational Health ("FOH") physician for an evaluation and recommendation.  Freimuth Aff. at 3.  The FOH physician requested information from plaintiff's physician, but that information was not provided until April 4, 2011.  *See* Request for Medical Flexiplace (FOH Letter) (describing several unsuccessful attempts to contact plaintiff's physician and stating that the additional information from her physician was received on April 4, 2011).  On April 18, 2011 the FOH physician recommended granting plaintiff's request and limiting plaintiff's travel into the office to no more than once every two weeks.  *Id.*  Medical flexi-place was granted and went into effect on April 26, 2011.  *See* Flexiplace Agreement, Def.'s Ex. 7, ECF No. 18-4.  Again, despite plaintiff's claims that she was denied medical flexi-place, the record reflects that her request was in fact granted and she was permitted to work from home from April 25, 2011 onward.

### b)      *Chair Accommodation*

Plaintiff also argues that during her pregnancy, she was denied the reasonable accommodation of a specific type of chair, and cites this is a basis for her Title VII claims.  Plaintiff has not, however, presented evidence showing that she was denied such a chair.  Instead, Ms. Freimuth testified that on January 21, 2011 plaintiff verbally requested a more comfortable chair, like the "hearing officer chair" in the OHA room.  Freimuth Aff. at 29.  On January 24, 2011, Ms.

---

[3] Plaintiff's responses to defendant's statements of fact regarding flexi-place do not undercut this conclusion.  She simply disputes that she required more supervision and states that Ms. Freimuth refused to discuss specific deadlines with her.  She argues that Ms. Freimuth did not want to grant plaintiff's request, even though she could have done so.  She does not argue that she was never granted regular flexi-place.

Freimuth told plaintiff that she could use the hearing officer chair except when it was needed for hearings. *Id.* Then, on February 2, 2011, the Deputy Director located a similar chair and gave it to plaintiff. *Id.* As evidence that she did not receive the chair requested, plaintiff points to the timeline of events that she prepared in support of her opposition brief, which is attached as Exhibit B, in which plaintiff states that her request was denied. *See* Pl.'s Amended Responses and Objections to Def.'s SOFs ¶¶ 44–48, ECF No. 41. This timeline, however, contains allegations, not evidence. *See* Pl.'s Ex. B at 9–10, ECF No. 42-1. Plaintiff has not submitted evidence that her request was denied or that Ms. Freimuth was lying in her affidavit about the course of events relating to the chair.

### c) *Banking Information*

Finally, plaintiff alleges that she was subjected to discrimination when management refused to return her banking information to her. Even assuming that this act could constitute an adverse employment action under Title VII, it cannot sustain plaintiff's claims because it is simply contradicted by the record. In plaintiff's PIP, Ms. Freimuth noted that one of plaintiff's case files contained "two pages of print-outs from a Bank of America website, which was non-work related material." PIP at 2, Def.'s Ex. 18, ECF No. 19-1. Plaintiff claims that she had inadvertently included the print out in the file and that Ms. Freimuth refused to return it because she wanted it to show that plaintiff mishandled case files. Although the PIP originally referenced two pages, "Ms. Freimuth issued a correction to the PIP that then indicated that 'a print-out' from Bank of America was found in the case file." Notice of Final Agency Action 40, Def.'s Ex. 1, ECF No. 18-3.

Plaintiff maintains that the document contained personal banking information, but her supervisors—Mr. Brown and Ms. Freimuth—have testified that the document contained no personal data. According to Mr. Brown's affidavit, the page was "an Internet document describing

contact information for Bank of America's online services" and "contained no personal information relating to the [plaintiff]." Brown Aff. at 12, ECF No. 18-3. He testified that "No OHA management or supervisory official was ever in possession of the [plaintiff's] personal banking information." *Id.* Ms. Freimuth confirmed that the information in the document was "publicly available" and that never had "plaintiff's personal banking information." Freimuth Aff. at 28.

They have also testified that the page was returned to plaintiff. Mr. Brown testified that he gave plaintiff the document on February 24, 2012 and that the allegation that management has refused to return plaintiff's banking information to her is "completely false." Brown Aff. at 12. Ms. Freimuth explained that after plaintiff complained to Mr. Brown, she "gave him the original of what I had found in the file and he returned it to [plaintiff]." Freimuth Aff. at 28. She further testified that "OHA management does not have [plaintiff's] banking information. Accordingly, there is no information to return." *Id.* at 29.

Plaintiff has not presented evidence that the print out contained personal information or that any personal information was not returned to her. She relies on the following: 1) February 23, 2012 and February 27, 2012 emails to the Secretary of Energy and the General Counsel of DOE in which she states that DOE officials have illegally obtained her personal banking information and are refusing to return it to her, Pl.'s Ex. QQQ, ECF No. 44-16; 2) a February 29, 2012 email to Mr. Brown and Mr. Marmolejos stating that Ms. Freimuth has refused to return her personal information, Pl.'s Ex. SS, ECF No. 43-18; and 3) a March 6, 2012 email to Mr. Marmolejos regarding her requests for the return of her financial information, Pl.'s Ex. AAAA, ECF No. 45.

These exhibits do not convince the Court that plaintiff has demonstrated that DOE officials 1) possessed her personal financial information or 2) never returned it to her. First, although these

exhibits show that in February and March of 2012, plaintiff believed that DOE possessed her personal banking information, plaintiff has offered nothing to rebut Mr. Brown's or Ms. Freimuth's affidavits, which were signed in May and June of 2012, respectively, and which state that DOE officials do not possess her banking information and that the information at issue contained no personal financial information. Furthermore, in one of the February 24, 2012 emails she states that "Fred Brown just returned one page of the information to me but I remain unsure as to if this is the entirety of the information that is in their possession." Pl.'s Ex. QQQ. As noted, although the PIP originally referenced two pages, Ms. Freimuth issued a correction to the PIP which stated that "a print out" was found in the case file. Plaintiff has presented no evidence showing that this revision was false and that DOE officials continued to possess her banking information.

Plaintiff appears to relying on the suspicion that the print out did contain personal information based on the fact that it was used to support an allegation of mishandling case files. In her responses and objections to the defendant's statement that "[p]laintiff's first and second line supervisors have testified that the page contained no personal data and was given back to Plaintiff by her second-line supervisor shortly after [p]laintiff requested the information be returned to her," she states the following: "If this were the case, WHY REFER TO IT IN THE PIP AT ALL???? Why tell Plaintiff (who had not seen it) that her personal banking information was being retained to support a false but extremely serious allegation of mishandling case files that continued [sic] sensitive information?" Pl.'s Responses and Objections to Def.'s SOFs ¶ 50. Such speculation is insufficient to demonstrate that the print out actually contained personal information.

In sum, in accordance with the foregoing, Plaintiff's claims for discrimination and retaliation under Title VII based on the following actions may proceed: 1) the denial of a promotion

in May 2011; 2) the fourteen day suspension issued on October 3, 2011; 3) the performance rating of "needs improvement" on November 3, 2011; 4) the counseling memorandum issued on November 3, 2011; 5) the PIP issued on February 24, 2012; 6) the allegedly false and defamatory statements placed in plaintiff's Personal Security Investigative File and OPM File; and 7) her termination on April 16, 2012.

Her Title VII discrimination and retaliation claims based on the following actions shall be dismissed: 1) the denial of regular flexi-place in February 2011; 2) the denial of medical flexi-place in February 2011; 3) the denial of the reasonable accommodation of a chair in January and February 2011; and 4) DOE management's refusal to return plaintiff's personal banking information to her.

### B. Rehabilitation Act/ADA Claims

Plaintiff claims that she suffered from a high-risk pregnancy (from October 2010 through July 2011), several pregnancy-related impairments, and post-partum hypertension from October 2010 through her removal in April 2012 and that the defendant had knowledge of such issues. She claims that she was discriminated against on the basis of her pregnancy and that she was denied access to reasonable accommodations. Plaintiff brings her claims under the ADA, which, as already noted, does not apply to federal employees. The defendant and this Court, however, construe plaintiff's complaint as bringing claims under the Rehabilitation Act, which is applicable to federal government employees.

In order to succeed on her claims, plaintiff must demonstrate that she suffered from a disability. Pregnancy itself is generally not considered a disability. *Jeudy v. Attorney Gen., Dep't of Justice*, 482 F. App'x 517, 520 (11th Cir. 2012); *Martinez v. N.Y. State Div. of Human Rights*, No. 1:13-CV-1252-GHW, 2015 WL 437399, at *11 (S.D.N.Y. Feb. 2, 2015) ("Every court to

consider the question to date has ruled that 'pregnancy and related medical conditions do not, absent unusual conditions, constitute a [disability] under the ADA.'"); *Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 489 (D. Md. 2013); *Olojo v. Kennedy-King Coll.*, No. 05 C 6234, 2006 WL 1648441, at *3 (N.D. Ill. June 7, 2006); *Farrell v. Time Serv., Inc.*, 178 F. Supp. 2d 1295, 1298 (N.D. Ga. 2001). It is only when the pregnancy results in impairments or conditions that "substantially limit[] one or more major life activities." 42 U.S.C. § 12102(1); *see Jeudy*, 482 F. App'x at 520; *Martinez*, 2015 WL 437399, at *11; *Wonasue*, 984 F. Supp. 2d at 490; *Olojo*, 2006 WL 1648441, at *3; *Farrell*, 178 F. Supp. 2d at 1298–99.

The contours of plaintiff's disability discrimination claims are unclear from her complaint. The Rehabilitation Act encompasses disparate treatment claims (intentional discrimination), failure to accommodate claims, and hostile work environment claims. *Drasek*, 121 F. Supp. 3d at 154 (collecting cases). Plaintiff only specifically states that defendant engaged in intentional disability discrimination, but, construing the complaint liberally, she appears to also bring claims for failure to accommodate and hostile work environment. Her failure to accommodate claims appear to be as follows: 1) she was denied medical flexi-place; and 2) she was denied the use of a specific chair. Her intentional discrimination claims appear to be based on the following events: 1) she was denied regular flexi-place in February 2011; 2) she was denied a promotion in May 2011; 3) she was issued a fourteen day suspension on October 3, 2011 for inappropriate behavior toward her supervisor, which she served in December 2011; 4) she receiving a performance rating of "needs improvement" on November 3, 2011; 5) she was issued a counseling memorandum on November 3, 2011; 6) she was placed on a PIP on February 24, 2012; 7) management refused to return her banking information to her; and 8) she was removed from Federal Service. Plaintiff's hostile work environment claim appears to be based on all of the above.

### 1. Intentional Discrimination

Although pregnancy itself is not a disability, plaintiff has sufficiently alleged that the many medical issues resulting from her pregnancy qualified her as having a disability while she was pregnant. She had nose bleeds, severe vomiting, infections, constipation, diarrhea, suspected placenta previa, back pain, polyhydramnios, hypertension, dehydration, subconjunctival hemorrhaging, and borderline preeclampsia. As a result, she was hospitalized at least once and was granted medical flexi-place. In her affidavit, she states that she had difficulty sitting for long periods of time, commuting to work, and working full time in the office. Webster Aff. 2, Def.'s Ex. 5, ECF No. 18-3. During her pregnancy, plaintiff was 1) denied regular flexi-place in February 2011 and 2) denied a promotion in May 2011. Defendant argues that because the other adverse actions occurred *after* plaintiff gave birth in July 2011, she was no longer suffering from a disability and her Rehabilitation Act claims based on such events cannot move forward. The Court disagrees. Plaintiff received a performance rating of "needs improvement" on November 3, 2011, but it was based on her performance for Fiscal Year 2011, which included the time she was pregnant. The counseling memorandum and PIP were directly based on this performance rating. She was suspended for fourteen days on October 3, 2011, but the suspension was based on actions that occurred while she was pregnant in March and April of 2011. Plaintiff was terminated in April of 2012, but that termination was based in part on a history of misconduct, including the misconduct that formed the basis of the fourteen day suspension.

Accordingly, the Court finds that plaintiff may bring intentional discrimination claims under the Rehabilitation Act for those events. For the same reasons as stated above in the Title VII context, plaintiff may not bring intentional discrimination claims under the Rehabilitation Act for the denial of regular flexi-place in February 2011 and DOE's alleged refusal to return banking

information to her because these allegations are contradicted by the current record. In addition, for the same reasons as stated above—namely the lack of discovery and the issues surrounding plaintiff's security clearance investigation—the Court finds that it is premature to consider whether defendant has offered legitimate, nondiscriminatory reasons for the taking the actions at issue, and whether plaintiff has offered evidence of pretext.

### 2. *Failure to Accommodate*

With respect to failure to accommodate, plaintiff claims that she was denied medical flexi-place and was denied the use of a specific chair. As noted above, the record actually shows that these accommodations were indeed provided to plaintiff. As explained above, plaintiff was granted medical flexi-place on April 26, 2011. *See* Supra Part IV(A)(2)(a). Plaintiff was also provided the use of the type of chair she requested. *See* Supra Part IV(A)(2)(b). Thus, even assuming that plaintiff successfully demonstrated the other elements of a prima facie case for failure to accommodate—that she had a disability, that her employer was on notice of her disability, and that with a reasonable accommodation she could perform the essential functions of her position—plaintiff's failure to accommodate claims fail because she is not able to establish the final element—that her employer refused to make the requested accommodations.

Thus, the Court will dismiss plaintiff's Rehabilitation Act claims for failure to accommodate. It will allow the Rehabilitation Act claims for intentional discrimination to move forward.

### C. **Hostile Work Environment**

Plaintiff also brings hostile work environment claims under Title VII and the Rehabilitation Act. Defendant argues in the alternative for dismissal of these claims or for the granting of

summary judgment in its favor. Again, the Court finds that it is appropriate to wait for discovery and the resolution of the issue described above before it considers such arguments.

### D. Whistleblower Protection Act

Finally, plaintiff brings claims under the WPA. Plaintiffs bringing WPA claims must exhaust their administrative remedies. "The Civil Service Reform Act ('CSRA'), Pub. L. No. 95–454, 92 Stat. 1111, codified in various sections of Title 5 of the United States Code, provides the exclusive set of remedies for claims brought pursuant to the WPA." *Harris v. Bodman*, 538 F. Supp. 2d 78, 82 (D.D.C. 2008), *aff'd*, No. 08-5091, 2008 WL 5532102 (D.C. Cir. Aug. 27, 2008). First, the employee must bring her claim to the Office of Special Counsel ("OSC") to investigate the complaint. *Stella*, 284 F.3d at 142 (citing 5 U.S.C. § 1214). Then, "[i]f the OSC finds that there was a prohibited personnel action as defined by [5 U.S.C.] § 2302, it reports its findings to the MSPB, and it can petition the MSPB on the employee's behalf. If the OSC finds no agency wrongdoing, then the employee herself may bring an action before the MSPB." *Id.* (internal citation omitted) (citing 5 U.S.C. §§ 1221; 1214(a)(3)). If the employee has filed a mixed case— a case that alleges both discriminatory and non-discriminatory conduct—she may "choose between filing a 'mixed case complaint' with the EEO office and filing a 'mixed case appeal' directly with the MSPB." *Hamilton v. Geithner*, 743 F. Supp. 2d 1, 13 (D.D.C. 2010), *aff'd*, 666 F.3d 1344 (D.C. Cir. 2012). The employee "must choose one procedural mechanism; recovery under both avenues is not available. Regardless of whether a complainant seeks to solely challenge a prohibited personnel action before the Office of Special Counsel, or in a 'mixed case' before the EEO office or MSPB, one of these administrative remedies must be exhausted before suit can be heard in federal court." *Id.* (internal citation omitted). "Under the CSRA, exhaustion of administrative remedies is a jurisdictional prerequisite to suit." *Weaver v. U.S. Info. Agency*, 87

F.3d 1429, 1433 (D.C. Cir. 1996). Thus, "[u]nder no circumstances does the WPA grant the District Court jurisdiction to entertain a whistleblower cause of action brought directly before it in the first instance." *Stella*, 284 F.3d at 142.

Plaintiff here did not submit a claim to the OSC. Plaintiff claims that she has complied with the exhaustion requirement because she contacted OSC to file a claim in October–November 2011. The exhibit to which plaintiff points to show that she filed a claim does not prove that she did so. It shows that she requested information on how to file a whistleblower complaint on October 28, 2011. *See* Pl.'s Ex. F, ECF No. 27-1. There is no evidence that such a complaint was filed. Plaintiff did file an EEO complaint on January 18, 2012, *see* DOE Complaint of Discrimination, Pl.'s Ex. II, ECF No. 43-8, which she supplemented on May 24, 2012 after she was terminated, *see* May 42, 2012 Email from F. Vaccarella, Pl.'s Ex. SSS, ECF No. 44-18. But, this complaint alleged discrimination, not whistleblower retaliation. It appears that plaintiff alleged whistleblower retaliation[4]—as an affirmative defense—for the first time in her MSPB appeal, which was filed on January 28, 2013. *See* MSPB Appeal Form, Pl.'s Ex. T, ECF No. 42-18. The MSPB regulations state that "[w]here the appellant has been subject to an action appealable to the Board, he or she may either file a timely complaint of discrimination with the agency or file an appeal with the Board no later than 30 days after the effective date, if any, of the action being appealed, or 30 days after the date of the appellant's receipt of the agency's decision on the appealable action, whichever is later." 5 C.F.R. § 1201.154(a); *see also Schlottman v. Perez*, 739 F.3d 21, 23 (D.C. Cir. 2014) ("Under the MSPB route, he must file his direct appeal within thirty days of the effective date of termination."). The MSPB appeal was clearly filed more than 30 days after plaintiff's termination and all of the other adverse actions at issue. Furthermore,

---

[4] Plaintiff's allegations regarding retaliation under Title VII is distinct from her whistleblower retaliation claims brought under the WPA.

plaintiff does not include any explanation that would enable the Court to conclude that the WPA claims were timely raised because they were filed "30 days after the date of the appellant's receipt of the agency's decision on the appealable action," given that the DOE's EEO decision did not discuss any whistleblower issues. Therefore the Court concludes that plaintiff has failed to demonstrate that she exhausted her administrative remedies on her WPA claims. As such, the Court lacks jurisdiction over these issues and will dismiss plaintiff's WPA claims.

## V.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part defendant's motion to dismiss and motion for summary judgment. The Court will deny the motion with respect to plaintiff's Title VII intentional discrimination and retaliation claims based on the following events: 1) the denial of a promotion in May 2011; 2) the fourteen day suspension issued on October 3, 2011; 3) the performance rating of "needs improvement" on November 3, 2011; 4) the counseling memorandum issued on November 3, 2011; 5) the PIP issued on February 24, 2012; 6) the allegedly false and defamatory statements placed in plaintiff's Personal Security Investigative File and OPM File; and 7) the termination on April 16, 2012. These claims may move forward.

The Court will grant the motion and dismiss the Title VII intentional discrimination and retaliation claims based on the following events: 1) the denial of regular flexi-place in February 2011; 2) the denial of medical flexi-place in February 2011; 3) the denial of the reasonable accommodation of a chair in January and February 2011; and 4) DOE management's refusal to return plaintiff's personal banking information to her. Title VII claims based on these events are dismissed from this action.

The Court will also deny the motion with respect to the Rehabilitation Act intentional discrimination claims based on the following events: 1) the denial of a promotion in May 2011; 2)

the fourteen day suspension issued on October 3, 2011; 3) the performance rating of "needs improvement" on November 3, 2011; 4) the counseling memorandum issued on November 3, 2011; 5) the PIP issued on February 24, 2012; and 6) the termination on April 16, 2012. Rehabilitation Act claims based on these events may move forward.

The Court will grant the motion and dismiss the Rehabilitation Act intentional discrimination claims based on the following events: 1) the denial of regular flexi-place in February 2011; and 2) DOE's alleged refusal to return banking information to plaintiff. The Court will also dismiss plaintiff's Rehabilitation Act failure to accommodate claims.

The Court will deny the motion with respect to plaintiff's hostile work environment claims brought under Title VII and the Rehabilitation Act. The hostile work environment claims may move forward.

Finally, the Court will grant the motion to dismiss with respect to plaintiff's Whistleblower Protection Act claims because plaintiff failed to exhaust her administrative remedies.

A separate Order accompanies this Memorandum Opinion.

Date: August **25**, 2017

Royce C. Lamberth
United States District Judge